# United States Court of Appeals for the Federal Circuit

---

**INTELLECTUAL VENTURES I LLC,
INTELLECTUAL VENTURES II LLC,**
*Plaintiffs-Appellants*

v.

**CAPITAL ONE FINANCIAL CORPORATION,
CAPITAL ONE BANK (USA), NATIONAL
ASSOCIATION, CAPITAL ONE, NATIONAL
ASSOCIATION,**
*Defendants-Appellees*

---

2016-1077

---

Appeal from the United States District Court for the District of Maryland in No. 8:14-cv-00111-PWG, Judge Paul W. Grimm.

---

Decided: March 7, 2017

---

IAN NEVILLE FEINBERG, Feinberg Day Alberti & Thompson LLP, Menlo Park, CA, argued for plaintiffs-appellants. Also represented by MARC BELLOLI, ELIZABETH DAY, CLAYTON W. THOMPSON, II; ERIC F. CITRON, Goldstein & Russell, P.C., Bethesda, MD.

MATTHEW J. MOORE, Latham & Watkins LLP, Washington, DC, argued for defendants-appellees. Also repre-

sented by GABRIEL BELL, ADAM MICHAEL GREENFIELD; JEFFREY G. HOMRIG, Menlo Park, CA; ROBERT A. ANGLE, DABNEY JEFFERSON CARR, IV, Troutman Sanders LLP, Richmond, VA; KENNETH R. ADAMO, DAVID WILLIAM HIGER, Kirkland & Ellis LLP, Chicago, IL.

---

Before PROST, *Chief Judge*, WALLACH and CHEN, *Circuit Judges.*

PROST, *Chief Judge.*

Intellectual Ventures I LLC and Intellectual Ventures II LLC (collectively, "IV") appeal from a final decision of the United States District Court for the District of Maryland finding all claims of U.S. Patent No. 7,984,081 ("'081 patent") and U.S. Patent No. 6,546,002 ("'002 patent") ineligible under 35 U.S.C. § 101 and barring IV from pursuing its infringement claims of U.S. Patent No. 6,715,084 ("'084 patent") under a collateral estoppel (issue preclusion) theory.[1] For the reasons discussed below, we affirm.

I

IV sued Capital One Financial Corporation, Capital One Bank (USA), National Association, Capital One, and National Association (collectively, "Capital One"), alleging infringement of the '084 patent, the '081 patent, and the '002 patent (collectively, "patents-in-suit") in the United States District Court for the District of Maryland. In response, Capital One asserted antitrust counterclaims against IV under the Sherman Act and moved for sum-

---

[1] IV additionally appealed the district court's finding of patent ineligibility of U.S. Patent No. 6,314,409. IV, however, withdrew this patent from appeal. IV's Mot. to Withdraw U.S. Patent No. 6,314,409 as an Appellate Issue at 2.

mary judgment on IV's infringement claims, arguing that the '081 and '002 patents are invalid under 35 U.S.C. § 101.

In a related proceeding, the United States District Court for the Southern District of New York entered a partial summary judgment order of ineligibility under § 101 for the '084 patent. *See Intellectual Ventures II, LLC v. JP Morgan Chase & Co.*, No. 13-cv-3777-AKH, 2015 WL 1941331, at *17 (S.D.N.Y. Apr. 28, 2015) ("*JPMC*"); J.A. 1343–74. Relying on the *JPMC* court's partial summary judgment order, Capital One moved for summary judgment in the District of Maryland under a collateral estoppel theory to bar IV's infringement action on those patents.

In response to Capital One's summary judgment motions, the district court invalidated the '081 and '002 patents under § 101 and barred IV from proceeding on its infringement claims as to the '084 patent under a collateral estoppel theory based on the *JPMC* court's findings. Having granted Capital One's summary judgment motion on collateral estoppel grounds, the District of Maryland elected not to independently reach the merits of the '084 patent's eligibility under § 101. After disposing of the patents-in-suit, and over IV's objection, the district court certified its judgment under Federal Rule of Civil Procedure 54(b) so that this appeal could proceed concurrently with Capital One's antitrust counterclaims in the District of Maryland.[2] IV filed its appeal. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

---

[2] In the related *JPMC* matter, although the Southern District of New York rendered a finding of invalidity at summary judgment as to the '084 patent under § 101, it denied IV's request for Rule 54 certification and immedi-

## II

On appeal, IV raises a number of issues regarding the proceedings below: (1) IV argues that the district court abused its discretion by certifying this appeal under Rule 54; (2) IV appeals the district court's determination that it is collaterally estopped from pursuing its patent infringement claims as to the '084 patent; and (3) IV appeals the district court's determination that the '081 and '002 patents are invalid under § 101. We take each issue in turn.

## A

We review the district court's decision to certify a partial final judgment under Rule 54(b) for an abuse of discretion. *See Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 437 (1956). On appeal, IV argues that the district court erred by merely providing a two-sentence Rule 54(b) certification statement without any specific findings or reasoning to support its conclusion. IV also asserts that because the district court did not make any findings or provide a rationale, any deference we owe to the district court "is nullified" under *Braswell Shipyards, Inc. v. Beazer E., Inc.*, 2 F.3d 1331, 1335–36 (4th Cir. 1993). Aside from attacking the sufficiency of the district court's reasoning, IV argues that the close interrelationship between its infringement claims and Capital One's antitrust counterclaims weighs against certification. IV therefore maintains that we should vacate the certification and remand the appeal.

Capital One responds that the district court's express finding of "no just reason for delay" supports its decision to certify. It also cites the district court's additional certification reasoning in response to IV's motion to

---

ate appeal. Thus, IV has not to date appealed the merits of that court's § 101 findings.

vacate the Rule 54(b) judgment. *See* J.A. 1728 (explaining why Rule 54(b) certification would create a more efficient use of judicial resources under this case's facts and procedural posture). Regarding its counterclaims, Capital One argues that the antitrust issues are not sufficiently interrelated to IV's infringement claims because its counterclaims implicate IV's patent portfolio, which encompasses roughly 3,500 patents.

We agree with Capital One that the district court did not abuse its discretion in certifying the appeal under Rule 54(b). Under that rule, "[w]hen an action presents more than one claim for relief . . . the court may direct entry of final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b).

First, regarding the sufficiency of the district court's findings, we observe that the district court set forth its reasoning for certification in two separate, independent orders. *See* J.A. 55 (concluding that "there is no just reason for delay[ing]" entry of judgment with the antitrust claims still pending in the initial motion); J.A. 1727–28 (weighing the potential benefits of reserving final judgment under a Rule 60 motion and concluding that judicial economy supports certification). Although the district court's initial ruling did not set forth a lengthy analysis in support of certification, it expressly determined that there was no just reason for delay. J.A. 55. Beyond this, the district court subsequently explained why judicial economy supports its initial determination.[3]

---

[3] In its reply brief, IV argues—without support—that a district court cannot use a subsequent order to "cure [the] defect" in its initial analysis. Reply Br. 24–25. Not so. The Fourth Circuit merely requires that the district court state its findings on the record or in its

J.A. 1728. Regarding the sufficiency of its analysis, therefore, we conclude that the district court did not abuse its discretion because it met the standard set forth by the rule.

Second, we review the extent to which the existence of Capital One's counterclaims affect the analysis. To do so, we may consider—among other factors—"the relationship between the adjudicated and unadjudicated claims." *Braswell Shipyards*, 2 F.3d at 1335–36. Here, Capital One's antitrust counterclaims implicate IV's patent portfolio of roughly 3,500 patents. J.A. 3026–27. Yet IV asserts only a narrow subset (the patents-in-suit) of that broader portfolio. *Id.* Further, the scope of Capital One's antitrust counterclaims transcends issues of mere infringement. *See id.* (alleging, among other things, wrongful conduct, concealing the scope of its portfolio, and demanding excessive licensing rates). Indeed, the mere existence of some factual overlap between the parties' claims and counterclaims does not necessarily lead to the conclusion that the district court abused its discretion. *See, e.g., W.L. Gore & Assocs. v. Int'l Med. Prosthetics Research Assocs.*, 975 F.2d 858, 864 (Fed. Cir. 1992) (recognizing that the factual overlap on one aspect of a counterclaim is not adequate to show an abuse of discretion). Under these facts, we conclude that the district court did not abuse its discretion given the tenuous relationship between the claims on appeal and counterclaims that remain. We have considered IV's remaining arguments, but find them unpersuasive. As a result, we affirm the district court and entertain the remaining issues on appeal.

---

order. *Braswell Shipyards*, 2 F.3d at 1336. This is precisely what it did. J.A. 55, 1728.

B

We review issues of preclusion de novo, applying the law of the regional circuit. *Aspex Eyewear, Inc. v. Zenni Optical Inc.*, 713 F.3d 1377, 1380 (Fed. Cir. 2013). Similarly, we review a district court's summary judgment ruling under the law of the regional circuit, *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1252 (Fed. Cir. 2014). The Fourth Circuit reviews the entry of summary judgment de novo. *Sylvia Dev. Corp. v. Calvert Cnty. Md.*, 48 F.3d 810, 817 (4th Cir. 1995). The Fourth Circuit has established five requirements for collateral estoppel. *See Ramsay v. U.S. Immigration & Naturalization Serv.*, 14 F.3d 206, 210 (4th Cir. 1994) (requiring that the issue in the prior proceeding be identical, actually determined, necessary, final, and that the affected party was afforded a full and fair opportunity to litigate the issue). Here, the parties only dispute the finality requirement, for which the Fourth Circuit requires a "final and valid" judgment. *In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 326 (4th Cir. 2004).

On appeal, IV challenges the district court's grant of partial summary judgment in which the court determined that IV was collaterally estopped from pursuing its patent infringement claims as to the '084 patent. It argues that the district court erred because it based its collateral estoppel findings on a partial summary judgment order by the *JPMC* court, rather than a final judgment. In support of its position, IV cites *Vardon Golf Co. v. Karsten Manufacturing Corp.*, 294 F.3d 1330 (Fed. Cir. 2002). In that case—applying Seventh Circuit law—we held a partial summary judgment order does not meet the finality requirement of collateral estoppel. *See id.* at 1333 (basing collateral estoppel necessarily on a decision that is "immune . . . to reversal or amendment") (citation omitted).

We conclude that under Fourth Circuit law, collateral estoppel attaches in light of the *JPMC* court's partial

summary judgment order. At the outset, we observe that IV's reliance on *Vardon* is misplaced because in that case, we applied the law of the Seventh Circuit. *See Vardon*, 294 F.3d at 1333 (applying an "immune . . . to reversal or amendment" standard for collateral estoppel to attach). The Fourth Circuit, however, applies a less rigid test of finality. *See Swentek v. USAIR, Inc.*, 830 F.2d 552 (4th Cir. 1987) (abrogated on other grounds). Under *Swentek*, finality neither demands final judgment, nor requires a party's appeal. *Id.* at 561. Rather, "[f]inality for purposes of collateral estoppel is a flexible concept and 'may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again.'" *Id.* (citation omitted). Indeed, "[a]s long as the prior adjudication of the identical issue is conclusive, [the court does not] require the issue to be tried again because it lacked the formality of an express order and a 'no just reason for delay' determination." *See id.* (noting that a trial judge need not enter judgment under Rule 54 and await appeal before ascribing a preclusive effect) (citation omitted).

Applying the Fourth Circuit's test, we conclude that the *JPMC* court's partial summary judgment order met the finality prong for the purposes of collateral estoppel. Here, the *JPMC* court granted Capital One's partial summary judgment motion after considering the parties' briefing and oral argument. 2015 WL 1941331, at *17. Indeed, in deciding *JPMC*, the United States District Court for the Southern District of New York "denied as moot" additional discovery motions related to the '084 patent. *Id.* Although the district court has not yet entered its judgment on IV's claims, it has nothing left to resolve absent a reversal and remand on appeal. Because this particular issue "has reached such a stage that [the district court would] see[] no really good reason for permitting it to be litigated again,'" the *JPMC* court's order meets the finality requirement under Fourth Circuit

precedent. *Swentek*, 830 F.2d at 561 (citation omitted). Thus, we conclude that collateral estoppel attaches as a result of the *JPMC* court's partial summary judgment order invalidating the '084 patent.

## C

The Fourth Circuit reviews the grant or denial of summary judgment de novo. *Sylvia Dev. Corp.*, 48 F.3d at 817. Patent eligibility under § 101 is an issue of law that we review without deference. *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015). Section 101 of the Patent Act defines patent-eligible subject matter as follows: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefore, subject to the conditions and requirements of this title." 35 U.S.C. § 101. In interpreting this statutory provision, the Supreme Court has held that its broad language is subject to an implicit exception for "laws of nature, natural phenomena, and abstract ideas," which are not patentable. *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014).

To determine whether the exception applies, the Supreme Court has set forth a two-step inquiry. Specifically, a court must determine: (1) whether the claim is directed to a patent-ineligible concept, i.e., a law of nature, a natural phenomenon, or an abstract idea; and if so, (2) whether the elements of the claim, considered "both individually and 'as an ordered combination,'" add enough to "'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1297–98 (2012)). Applying this two-step inquiry to claims challenged under the abstract idea exception, we typically refer to step one as the "abstract idea" step and step two as the "inventive concept" step. *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016).

Under the "abstract idea" step we evaluate "the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter." *Id.* If the claim is directed to a patent-ineligible concept, we proceed to the "inventive concept" step. For that step we "look with more specificity at what the claim elements add, in order to determine 'whether they identify an "inventive concept" in the application of the ineligible subject matter' to which the claim is directed." *Id.* at 1258 (quoting *Elec. Power Grp. v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016)).

On appeal, IV challenges the district court's determinations that the '081 and '002 patents fail under step one and step two of *Alice* under § 101.

## THE '081 PATENT

The '081 patent consists of twenty-nine claims relating to methods, systems, and apparatuses for dynamically managing eXtensible Markup Language ("XML") data. XML is a specialized mark-up computer language developed in the mid-1990s that defines a set of rules for encoding documents in both a human- and machine-readable format. J.A. 663–64. Given this unique encoding, XML documents have specific format requirements for the data contained in the document, and tags that define what data the system stores at each position within an XML document. *See* J.A. 895 (discussing the use of nested structures to preserve the relationship of data within a given XML document). The '081 patent explains that companies frequently use XML documents to publish various types of information that customers and partners use, such as invoices, purchase orders, and price lists. Because XML users can create their own unique formats using these XML rules, not all formats are compatible. Therefore, companies attempting to share these types of XML documents may find them incompatible with their own XML formats. Resolving this conflict, the '081 patent

contends, was a difficult task that required specialized programming skills to manipulate and transfer XML documents into the desired format.

Thus, the '081 patent identified what its inventor perceived as a need to "allow[] the user to view and update XML documents in different formats, and allow[] the user to manipulate the data and perform actions without programming skills." '081 patent col. 1 ll. 45–48. To fulfill this need, the patent describes presenting the user with a second document—the "dynamic document"— which is based upon data extracted from the original XML document. According to the patent, the user can then make changes to the data displayed in the dynamic document and the changes will be dynamically propagated back into the original XML document (despite the acknowledged compatibility problems with such documents). Viewed within this framework, we turn to the specific language of the claims. For convenience, we reproduce claim 21 below.[4]

> 21. An apparatus for manipulating XML documents, comprising:
>
> a processor;
>
> a component that organizes data components of one or more XML documents into data objects;
>
> a component that identifies a plurality of primary record types for the XML documents;

---

[4]     Although IV did not expressly concede that claim 21 is representative of the claimed invention, it acknowledged that the invention "is memorialized in [this claim]." Appellants' Br. 11. Accordingly, we conclude that claim 21 is representative. *See also* J.A. 12 (asserting that the parties agreed that claim 21 is representative).

a component that maps the data components of each data object to one of the plurality of primary record types;

a component that organizes the instances of the plurality of primary record types into a hierarchy to form a management record type;

a component that defines a dynamic document for display of an instance of a management record type through a user interface; and

a component that detects modification of the data in the dynamic document via the user interface, and in response thereto modifies a data component in an XML document.

'081 patent col. 20 ll. 43–61.

In short, the '081 patent concerns a system and method for editing XML documents. Stripped of excess verbiage, the claim creates the dynamic document based upon "management record types" ("MRTs") and "primary record types" ("PRTs"). The inventor coined these terms to describe the organizational structure of the data at issue. A PRT is a simple data structure that contains unspecified data extracted from XML documents and an MRT is merely a collection of PRTs. '081 patent col. 2 ll. 5–12. A user interface then displays the dynamic document to the user to permit the user to make modifications to the document. In response to these changes made to the dynamic document, the system somehow modifies the underlying XML document.

1

We find that, under step one, the claims of the '081 patent are abstract. We conclude that the patent claims are, at their core, directed to the abstract idea of collecting, displaying, and manipulating data.

We have held other patent claims ineligible under § 101 for reciting similar data manipulation steps. For instance, in *Content Extraction and Transmission LLC v. Wells Fargo Bank, National Ass'n*, we held the concept of "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory" abstract. 776 F.3d 1343, 1347 (Fed. Cir. 2014). In particular, the invention there involved extracting data from a document, entering the data into appropriate data fields, and storing the data in memory. *Id.* at 1345. In *Intellectual Ventures I LLC v. Capital One Bank (USA)*, we concluded that customizing information and presenting it to users based on particular characteristics is abstract as well. 792 F.3d 1363, 1370 (Fed. Cir. 2015) ("*Intellectual Ventures I*"). And in *Electric Power Group*, we explained that an invention directed to collection, manipulation, and display of data was an abstract process. 830 F.3d at 1353–54 (Fed. Cir. 2016). Here, the '081 patent's concept related to the collection, display, and manipulation of data is similarly abstract.

According to IV, the '081 patent provides a concrete solution to a problem in computer programming, i.e., how to "dynamically manage multiple sets of XML documents." Appellants' Br. 31 (citation omitted). IV maintains that because the invention relates to a specialized computer language—XML—and renders otherwise incompatible documents compatible through a unique dynamic document based on MRTs and PRTs, it is neither abstract, nor an age-old idea like *Alice's* "intermediated settlement." Appellants' Br. 32 (quoting *Alice*, 134 S. Ct. at 2359).

IV's characterization, however, does not change the result. Although IV correctly observes that the '081 patent applies to XML documents in particular (rather than any other type of document), at best, this limits the invention to a technological environment for which to apply the underlying abstract concept. But such limita-

tions do not make an abstract concept any less abstract under step one. *Intellectual Ventures I*, 792 F.3d at 1366. As the specification recognizes, companies have frequently employed XML documents in routine business transactions. '081 patent col. 1 ll. 28–36. Thus, the patent's recitation of XML documents specifically, does little more than restrict the invention's field of use. Such limitations do not render an otherwise abstract concept any less abstract. *Affinity*, 838 F.3d at 1259.

IV's identification of the '081 patent's specific data structures and objects (PRTs and MRTs) also does not change our analysis under this step. In particular, IV argues that the '081 patent creates these specific data structures to interrelate various XML documents in a particular way to ensure compatibility of otherwise incompatible documents. IV maintains that these structures provide a concrete solution through a component that detects modifications to the dynamic document and in response thereto, propagates those changes back to the underlying XML document. We disagree.

Although these data structures add a degree of particularity to the claims, the underlying concept embodied by the limitations merely encompasses the abstract idea itself of organizing, displaying, and manipulating data of particular documents. *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014) ("[A]ny novelty in implementation of the idea is a factor to be considered only in the second step of the Alice analysis."). The PRTs and MRTs are, at bottom, broadly defined labels for generic data types that transfer data from one type of electronic document to another—here, the so-called dynamic document. The resulting dynamic document, in turn, is nothing more than an interface for displaying and organizing this underlying data. These features, therefore, do not alter our conclusion that the claimed invention is directed to the abstract concept of collecting, displaying, and manipulating data of particular docu-

ments. Having concluded that the invention is drawn to an abstract idea, we move to step two.

2

In applying step two of the *Alice* analysis, we "determine whether the claims do significantly more than simply describe [the] abstract method" and thus transform the abstract idea into patentable subject matter. *Ultramercial*, 772 F.3d at 715. We look to see whether there are any "additional features" in the claims that constitute an "inventive concept," thereby rendering the claims eligible for patenting even if they are directed to an abstract idea. *Alice*, 134 S. Ct. at 2357. Those "additional features" must be more than "well-understood, routine, conventional activity." *Mayo*, 132 S. Ct. at 1298.

With regard to the claims at issue, we perceive no "inventive concept" that transforms the abstract idea of collecting, displaying, and manipulating XML data into a patent-eligible application of that abstract idea. Rather, the claims recite both a generic computer element—a processor—and a series of generic computer "components" that merely restate their individual functions—i.e., organizing, mapping, identifying, defining, detecting, and modifying. That is to say, they merely describe the functions of the abstract idea itself, without particularity. This is simply not enough under step two. *See Ultramercial*, 772 F.3d at 715–16 (holding the claims insufficient to supply an inventive concept because they did not "do significantly more than simply describe [the] abstract method," but rather are simply "conventional steps, specified at a high level of generality") (quoting *Alice*, 134 S. Ct. at 2357).

IV argues that the '081 patent claims, however, unconventionally improve a technological process. The claims, according to IV, specify how to manage and modify XML documents of varying formats and syntax in a way that departed from convention. It argues that the patent

accomplishes this by creating a "dynamic document" based upon the MRTs and PRTs, so the system can modify multiple sets of XML data components at once through a user interface. We conclude, however, that these data structures do not sufficiently transform the abstract concept into a patentable invention under step two. In particular, the MRTs and PRTs—although technical sounding—include generic data types for which the system can store the extracted data. *See* '081 patent col. 2 ll. 4–9 ("A PRT is similar to a relational database table; they contain most of the data. An MRT includes a grouping of PRTs; they contain pointers to individual PRT records and some calculated data."). Indeed, as the district court observed, IV set forth particular definitions for these terms that describe them as generic data structures. *See* J.A. 29–30 (defining a PRT as "a data type that defines a data structure to contain data extracted from XML documents" and MRT as "a data type that defines a collection of primary records types"). The mere fact that the inventor applied coined labels to conventional structures does not make the underlying concept inventive. *See, e.g., Alice*, 134 S. Ct. at 2352 n.2, 2360 (finding the claims abstract despite the recitation of technical-sounding names such as "shadow credit record[s]" and "shadow debit record[s]"). And the recited dynamic document provides little more than an unspecified set of rules for displaying and organizing MRTs in a user interface akin to the generic interfaces we have elsewhere explained impart no inventive concept. *See, e.g., Intellectual Ventures I*, 792 F.3d at 1370 (finding that the recited "interactive interface" was not a "specific application of the abstract idea that provides an inventive concept"); *Affinity*, 838 F.3d at 1262 (characterizing a "graphical user interface" as a "generic feature" of the invention).

IV next submits that the specific combination of PRTs, MRTs, and a dynamic document overcomes the previous problem of the "incompatibility of XML docu-

ments with different 'XML syntax[es]' and different 'XML formats, relational database schemes, and messages formats.'" Appellants' Br. 40 (citing J.A. 168, 1388). In particular, IV argues that the claims set forth a unique solution to a problem with contemporary XML documents. *Id.* at 45. But the claims do not recite particular features to yield these advantages. Although the claims purport to modify the underlying XML document in response to modifications made in the dynamic document, this merely reiterates the patent's stated goal itself. Nothing in the claims indicate what steps are undertaken to overcome the stated incompatibility problems with XML documents to propagate those modifications into the XML document. Indeed, the claim language here provides only a result-oriented solution, with insufficient detail for how a computer accomplishes it. Our law demands more. *See Elec. Power Grp.,* 830 F.3d at 1356 (cautioning against claims "so result focused, so functional, as to effectively cover any solution to an identified problem").

In sum, evaluating these claimed elements either individually or as an ordered combination, we conclude that they recite no more than routine steps of data collection and organization using generic computer components and conventional computer data processing activities. Although this patent purports to have met a need in the art to "allow[] the user to view and update XML documents in different formats, and . . . manipulate the data and perform actions without programming skills," the claims recite nothing inventive or transformative to achieve this stated goal. '081 patent col. 1 ll. 45–48. Thus, taken individually or in combination, the recited limitations neither improve the functions of the computer itself, nor provide specific programming, tailored software, or meaningful guidance for implementing the abstract concept. *Alice,* 134 S. Ct at 2359. Accordingly, they do not meaningfully limit the claims to provide the requisite inventive concept under step two.

We conclude, therefore, that the asserted claims of the '081 patent do not meet the standard for eligibility under § 101 and affirm the district court's entry of summary judgment.

### THE '002 PATENT

Turning to the '002 patent, IV appeals the district court's finding on summary judgment of ineligible subject matter under § 101. We provided a separate analysis of this patent in our opinion in the companion appeal. *See Intellectual Ventures I LLC v. Erie Indemnity Co.*, Nos. 2015-1128, -1129, -1132, slip op. at 22–27 (Fed. Cir. March 7, 2017) (affirming the district court's dismissal under Rule 12 for reciting patent-ineligible subject matter). Because nothing in the record before us here leads us to conclude otherwise, we affirm the district court's entry of summary judgment of ineligibility of the asserted claims on the basis of our findings and conclusions in our opinion for that appeal.

### CONCLUSION

For the foregoing reasons, we affirm the district court.

**AFFIRMED**